[747 NYS2d 468]

Computer Possibilities Unlimited, Inc., Appellant, v Mobil Oil Corporation, Respondent.

First Department, September 26, 2002

APPEARANCES OF COUNSEL

*Jennifer R. Scullion* of counsel (*David N. Ellenhorn* on the brief; *Solomon, Zauderer, Ellenhorn, Frischer & Sharp,* attorneys), for appellant.

*Douglas M. Garrou* of counsel (*Jeffrey W. Gutchess* on the brief; *Hunton & Williams,* attorneys), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

The parties to this action entered into a contract requiring plaintiff, a software company, to offer its product to defendant's franchisees at prices not exceeding those specified in the agreement. This appeal requires us to determine whether plaintiff repudiated this contract by secretly entering into an agreement with a third-party distributor that gave the distributor complete control over the prices to be charged for the product. We hold that such conduct constituted a repudiation of plaintiff's contract with defendant. We further hold, given that plaintiff kept its repudiation secret from defendant, that defendant did not lose its right to elect to treat its contractual obligations as discharged by the repudiation even though it continued to treat the contract as in effect for five months after the repudiation occurred. Accordingly, since anything defendant did after the repudiation is not actionable as a breach, and any claim based on defendant's alleged breaches prior to the repudiation is time-barred, Supreme Court correctly granted defendant summary judgment dismissing the complaint.

### FACTS

*The Parties*

Plaintiff Computer Possibilities Unlimited, Inc. (CPU), a closely held New York corporation, is the developer and owner of "Servistat," a computer software product that performs "back-office" data management functions for automobile service stations, such as inventory and accounting.

Defendant Mobil Oil Corporation (Mobil), a New York corporation, sells petroleum-based products to the public through a nationwide network of service stations. While many of these stations are directly owned by Mobil, approximately 3,200 Mobil stations are owned and operated by independent franchisees, who exercise a large measure of autonomy in running their businesses. Only the stations operated by franchisees (hereinafter dealers) are pertinent to this action.

*The Endorsement Agreement*

In 1990, Mobil undertook to identify a back-office computer software package to endorse for purchase by its dealers. To that end, in August 1990, Mobil issued a request for proposals to several software vendors, including CPU. CPU submitted a proposal to Mobil in September 1990. In December 1990, Mobil announced that it had selected CPU's Servistat product as the software it intended to endorse. Thereafter, Mobil and CPU entered into an Endorsement Agreement, dated January 30, 1991.

The Endorsement Agreement provided that it would be in effect for three years, from January 30, 1991 to January 30, 1994. The opening recitations stated that both parties recognized that, notwithstanding Mobil's endorsement of Servistat, Mobil dealers "operate as independent businesses and exercise sole discretion as to what, if any, data management system the dealer utilizes [*sic*]," and that Mobil was not representing to CPU that the endorsement would result in any number of subscriptions.

The Endorsement Agreement required Mobil, among other things, to "exclusively endorse" Servistat for use by Mobil dealers. In return, CPU agreed to offer to sell Servistat to Mobil dealers "at prices not to exceed" those specified in the Endorsement Agreement. The Agreement set forth maximum prices for the first year, subject to adjustment for inflation in subsequent years, based on the assumption of "minimum sales of 400 units in the first year, and a smaller but substantial number of sales in succeeding years of the Agreement." The Agreement further provided that, if less than 300 units were sold during the first nine months, the maximum prices set forth by the Agreement would be adjusted upward by not more than 20%.

*CPU's Difficulties in Selling Servistat to Mobil Dealers*

It is undisputed that CPU met with little initial success in marketing Servistat to Mobil dealers. In fact, nine months after the Endorsement Agreement went into effect, less than 50 sales had been made—far less than the number on which the Agreement's prices had been based. The parties dispute the reason for these disappointing results.

CPU contends that, at the time of contracting, the parties had understood Mobil's obligation to "exclusively endorse" Servistat to include having its Sales and Business Consultants (SBCs), who provide advice to Mobil dealers, promote Servistat

in the course of their regular contact with the dealers and pass on "sales leads" to CPU. CPU attributes the low sales figures for Servistat to Mobil's failure to support Servistat through such efforts of its SBCs, as well as to certain other alleged breaches of the Agreement by Mobil.

For its part, Mobil denies that it had any obligation to require its SBCs to promote Servistat or to provide CPU with sales leads, pointing out that no such obligation was expressly set forth in the Endorsement Agreement, which contained a merger clause. It is Mobil's position that the Endorsement Agreement made the marketing of Servistat CPU's responsibility, and required Mobil to assist CPU's marketing efforts only to the limited extent expressly spelled out in the Agreement. Mobil attributes the poor sales figures for Servistat to the dealers' unanticipated lack of interest in computerizing the back-office operations of their cash businesses, among other factors.

*CPU's October 1991 Marketing Agreement With MicroSource*

On or about October 29, 1991, CPU entered into a Software Marketing and Distribution Agreement with nonparty Micro-Source Technologies, Inc. (MicroSource). Under the Micro-Source Agreement, MicroSource was appointed as the exclusive distributor of Servistat in the United States and Canada, with the exception of the New York City and Philadelphia areas.

As here pertinent, the MicroSource Agreement provided that MicroSource, not CPU, would control the prices customers would be charged for Servistat, and did not require Micro-Source to adhere to the pricing limits set forth in the Endorsement Agreement. Specifically, section 9 (d) of the MicroSource Agreement provided:

"PRICES AND TERMS; TRIAL SALES. * * *

"d. Although CPU may publish a suggested resale price list, *MICROSOURCE and Subdistributors have the right to determine their own resale prices, and CPU will not require that any particular price be charged* * * *." (Emphasis added.)

In addition, the pricing schedule to the MicroSource Agreement provided special pricing to be applicable "to the extent MicroSource, *in its sole discretion*, elects to honor the CPU special pricing arrangement with Mobil * * *" (emphasis added).

At his deposition, Harry Stern, CPU's president, admitted that, by signing the MicroSource Agreement, CPU had "lost control over the Mobil pricing" of Servistat. Similarly, Kenneth

Bender, a MicroSource vice-president, confirmed in an affidavit that, for sales to Mobil dealers subsequent to those Micro-Source had obtained at an October 1991 convention, "it was left to MicroSource's discretion whether to honor * * * the special pricing arrangements agreed to by CPU and Mobil."

*CPU's Representations to Mobil*
*Concerning the MicroSource Agreement*

While the MicroSource Agreement was being negotiated, Mobil executive Joan Nowak sent CPU's Harry Stern a letter, dated October 22, 1991, stating, among other things, the following:

> "It is our understanding that [MicroSource] has been selected to assist in the sale, training, and installation of software programs. The contract you arrange with [MicroSource] should ensure compliance with your contract with Mobil. You have agreed to forward to me for my records a copy of said contract."

Stern responded to Nowak by letter dated November 5, 1991 (after the date of the MicroSource Agreement), stating in pertinent part:

> "Although I agreed to consider sending you a copy of the [MicroSource] contract, I find I cannot do so. The contract contains 29 pages of detailed, confidential trade information which I cannot release. I am happy to discuss with you those sections of the contract which impact the Mobil-CPU relationship.
>
> "For example, the contract contains provision for Mobil pricing * * *."

Stern's November 5, 1991 letter did not disclose that, by entering into the MicroSource Agreement, CPU had given MicroSource complete control over pricing. It appears that Mobil did not receive a copy of the MicroSource Agreement, or otherwise learn of that Agreement's provisions giving Micro-Source unfettered control over pricing, until after Mobil terminated the Endorsement Agreement in March 1992.

*Mobil's Termination of the Endorsement Agreement*

After entering into the MicroSource Agreement, CPU made a number of overtures to Mobil proposing that the Endorsement Agreement be renegotiated to increase the maximum prices that Mobil dealers could be charged for Servistat. CPU justified these requests on the ground that the "cost of sale is so

much higher than anticipated, we simply can't afford to sell at the prices permitted by the [Endorsement] [A]greement." In all these discussions, it is undisputed that CPU kept silent about the fact that CPU had already surrendered control over the pricing of its product by entering into the MicroSource Agreement.

Ultimately, Mobil responded to CPU's assertions that it could not afford to comply with the Endorsement Agreement's pricing provisions by unilaterally terminating the contract. In a letter to CPU's Stern, dated March 27, 1992, Mobil executive V.B. Betette stated:

> "[I]t is apparent to me that you have reached the conclusion that CPU cannot achieve its business objectives within the contractual boundaries of our Endorsement Agreement. Having come to this point, I believe it is better to terminate the Endorsement Agreement rather than to continue to devote further time and effort at building justification for failure of the Agreement to produce the results both of our companies intended."

Among other things, Betette's letter observed: "You advise that prices for products and services fixed by the [Endorsement] Agreement cannot be honored. The contract was entered into by Mobil with a firm expectation that such prices would be honored."

CPU contends, based on internal Mobil correspondence and deposition testimony, that Mobil's termination of the Agreement was motivated, not by any of CPU's alleged defaults, but by a desire to placate certain Mobil executives and influential Mobil dealers who believed that giving Mobil's exclusive endorsement to a single software vendor had been a mistake. CPU also argues that Mobil's termination of the Endorsement Agreement was itself a breach of the contract, since the termination did not comply with section V (B) of the Agreement, providing that the contract could be terminated on grounds of default only upon written notice to the defaulting party and that party's failure to cure the default within 30 days thereafter.

*This Litigation*

After receiving the March 1992 letter terminating the Endorsement Agreement, CPU initially elected to try to continue to work with Mobil, albeit without an exclusive endorsement arrangement, in the hope of making sales to Mo-

bil dealers. In 1997, however, CPU decided to sue Mobil for its termination of the Endorsement Agreement and other alleged breaches of that contract. This action for breach of contract was commenced by CPU against Mobil on December 15, 1997. Thus, the December 1997 commencement of this action was within the six-year limitation period applicable to an action for breach of contract (see CPLR 213 [2]) if one measures from the date of Mobil's termination of the Endorsement Agreement (March 27, 1992). The action was, however, commenced more than six years after the date on which CPU entered into the MicroSource Agreement (October 29, 1991).

After discovery, Mobil moved for summary judgment dismissing the complaint, arguing, inter alia, that CPU's entry into the MicroSource Agreement, by virtue of its transfer of control over pricing from CPU to MicroSource, constituted a repudiation of the Endorsement Agreement and thus discharged all of Mobil's obligations under the Endorsement Agreement from the date of the MicroSource Agreement forward. Therefore, Mobil argued, as a matter of law, none of its alleged breaches of the Endorsement Agreement on or after October 29, 1991 (including the termination of the Agreement) was actionable, and any claim based on earlier alleged breaches of the contract was time-barred as of December 1997, when this action was commenced.

In response to the foregoing argument, CPU took the position that it had not repudiated the Endorsement Agreement by entering into the MicroSource Agreement. CPU observed that, notwithstanding that the MicroSource Agreement gave MicroSource control over pricing, it was always possible for MicroSource to choose to abide by the pricing provided by the Endorsement Agreement in its sales to Mobil dealers. In fact, CPU pointed out, MicroSource never departed from the Endorsement Agreement's pricing in any sale to a Mobil dealer prior to Mobil's termination of the Endorsement Agreement. CPU further argued, inter alia, that, notwithstanding any effect the execution of the MicroSource Agreement might potentially have had as a repudiation, the Endorsement Agreement remained in effect thereafter because Mobil did not promptly elect to terminate it on that ground. Therefore, CPU argued, its claim for total breach based on Mobil's termination of the Endorsement Agreement in March 1992, as well as its claim for any breaches in Mobil's performance in the interval between December 15, 1991 and the termination of the Endorsement Agreement, were timely when this action was commenced on December 15, 1997.

The IAS court granted Mobil's motion for summary judgment. Among other things, the court essentially agreed with Mobil's arguments on the issues of repudiation, discharge and the statute of limitations. This appeal by CPU followed, and we now affirm.

*Whether CPU Repudiated the Endorsement Agreement*

The first issue to emerge is whether CPU repudiated the Endorsement Agreement by entering into the MicroSource Agreement. A party's repudiation, or anticipatory breach, of its future obligations under a bilateral contract, such as the Endorsement Agreement, may take the form "either [of] 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach'" (*Norcon Power Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 463, quoting Restatement [Second] of Contracts § 250). Besides giving the non-repudiating party an immediate right to sue for damages for total breach (*id.*), a repudiation discharges the nonrepudiating party's obligations to render performance in the future (*see e.g. American List Corp. v U.S. News & World Report*, 75 NY2d 38, 44; *Pitcher v Benderson-Wainberg Assoc. II*, 277 AD2d 586, 587, *lv dismissed* 96 NY2d 792; *Dembeck v Hassler*, 248 AD2d 148, 149, *lv denied* 92 NY2d 805; *Duke Media Sales v Jakel Corp.*, 215 AD2d 237, 238; Restatement [Second] of Contracts § 253 [2]; 2 Farnsworth, Contracts § 8.20, at 527 [2d ed]).

Furthermore, it has long been the law that a party repudiates a contract "where [that] party, before the time of performance arrives, puts it out of his power to keep his contract" (*Union Ins. Co. of Philadelphia v Central Trust Co. of N.Y.*, 157 NY 633, 643; *see also Lovell v St. Louis Mut. Life Ins. Co.*, 111 US 264, 274; *Pennsylvania Steel Co. v New York City Ry. Co.*, 198 F 721, 743 [2d Cir]; *Drake v Hodgson*, 192 App Div 676, 684; 22A NY Jur 2d, Contracts § 447 [1996 rev ed]). Stated otherwise, a party repudiates a contract when it "voluntar[il]y disable[s] itself from complying" with its contractual obligations (*Goodman Mfg. Co. L.P. v Raytheon Co.*, 1999 WL 681382, *8, 1999 US Dist LEXIS 13418, *23 [SD NY, Aug. 31, 1999, 98 Civ 2774] [holding that plaintiffs stated a claim for repudiation of a noncompete covenant by alleging that defendant had sold a subsidiary, which defendant had promised not to permit to

compete with plaintiffs, to a third party not bound by the covenant]).

In this case, CPU clearly did "put[ ] it out of [its] power" (*Union Ins. Co. of Philadelphia*, 157 NY at 643) to offer Servistat to Mobil dealers at prices not exceeding the maximum prices under the Endorsement Agreement. By its plain terms, the MicroSource Agreement transferred from CPU to Micro-Source the power to determine the prices at which the Servistat product would be sold, and expressly provided that Micro-Source, "in its sole discretion," would determine whether or not to honor the price provisions of the Endorsement Agreement. Even though the prices MicroSource charged Mobil dealers for Servistat happened to conform to the requirements of the Endorsement Agreement, this was not the result of CPU's performance of its obligations under the Endorsement Agreement, because CPU (as it admits in its brief) had divested itself of any "direct control" over the prices charged for the product. In short, the Endorsement Agreement obligated CPU to *ensure* that Mobil dealers were charged prices not exceeding specified levels for Servistat, and the MicroSource Agreement made it impossible for CPU to perform that obligation.

As the IAS court recognized, the Restatement (Second) of Contracts (the Restatement) offers an illustration demonstrating that a party to a contract is deemed to have repudiated the contract by giving a nonparty to the contract the power to determine whether the party's contractual obligations will be fulfilled—precisely what CPU did by entering into the Micro-Source Agreement. The Restatement's illustration is based on a hypothetical contract, made on April 1, by which A agrees to sell and B to buy land, with closing to occur on July 30. The illustration posits that "A says nothing to B on May 1, but on that date he contracts to sell the land to C. *A's making of the contract with C is a repudiation*" (Restatement § 250, Comment *c*, Illustration 5 [emphasis added]; *see also James v Burchell*, 82 NY 108, 112 [purchaser of land "was not bound to proceed and complete the contract" after the vendors "had parted with their title by a conveyance to a stranger"]; 2 Farnsworth, Contracts § 8.21, at 539). Thus, in the Restatement's illustration, the possibility that C might voluntarily decide to honor A's contract to convey the land to B does not prevent A's intervening contract with C from constituting a repudiation. Here, by analogy, MicroSource's voluntary election to honor the Endorsement Agreement's pricing provisions—a course taken by MicroSource as a matter of choice, not pursuant to

any contractual obligation, and which MicroSource could have abandoned at any time—does not change the fact that CPU had repudiated the Endorsement Agreement by giving Micro-Source the power to ignore that Agreement in setting the prices Mobil dealers would be charged for Servistat.

In arguing that it did not necessarily repudiate the Endorsement Agreement by executing the MicroSource Agreement, CPU relies heavily on this Court's decision in *Rachmani Corp. v 9 E. 96th St. Apt. Corp.* (211 AD2d 262). *Rachmani*, however, presented a scenario precisely the reverse of the instant case. In *Rachmani*, the broker that sought to recover commissions under its exclusive agency agreement had never repudiated that agreement, but the seller arguably had done so by ceasing to use the broker's services before the closing of the subject co-operative offering. Thus, assuming that the seller had repudiated the agency agreement (a question that we had no need to answer in *Rachmani*), the broker had the option to wait to sue until the repudiating party refused to perform by paying commissions at the closing, whereupon the statute of limitations commenced to run. Here, by contrast, CPU, the party that repudiated the Endorsement Agreement by entering into the MicroSource Agreement, now seeks to enforce the same contract it repudiated by suing Mobil for its subsequent termination of that contract.

Given that CPU repudiated the Endorsement Agreement by entering into the MicroSource Agreement in October 1991, the execution of the MicroSource Agreement immediately discharged all of Mobil's remaining obligations under the Endorsement Agreement (*see American List Corp.*, 75 NY2d at 44). Therefore, as a matter of law, nothing Mobil did after the execution of the MicroSource Agreement—including its termination of the Endorsement Agreement in March 1992—is actionable as a breach of contract, even if the contract technically remained in effect until Mobil finally terminated it.* Moreover, because the MicroSource Agreement was executed more than six years before this action was commenced, the action is time-

---

* CPU's argument that the Agreement remained in effect until terminated, even if correct, does nothing to advance its position on this appeal. Since it is CPU, not Mobil, that first repudiated the Endorsement Agreement, all that would follow from the Agreement's remaining in effect after CPU's secret repudiation is that the parties would have remained potentially liable for any breaches of the Agreement solely in the event Mobil ultimately elected to keep the Agreement alive notwithstanding the repudiation. Since Mobil has not exercised this option, the fact that the Agreement technically survived CPU's repudiation for five months has no significance for this appeal.

barred to the extent it is based on any breaches of the Endorsement Agreement Mobil allegedly committed prior to the execution of the MicroSource Agreement (*see* CPLR 213 [2]). Thus, the IAS court correctly granted Mobil summary judgment dismissing the complaint in its entirety.

*Whether Mobil Elected to Disregard CPU's Repudiation*

CPU argues, in the alternative, that, even if its execution of the MicroSource Agreement constituted a repudiation of the Endorsement Agreement, Mobil waived, or elected to disregard, that repudiation by continuing to treat the Endorsement Agreement as in force for about five months after the repudiation. The short answer to this contention is that Mobil could not waive a repudiation that CPU kept secret from Mobil until after Mobil terminated the Endorsement Agreement. None of the decisions CPU cites in support of this argument requires us to reward CPU for its lack of candor by penalizing Mobil for failing to react immediately to a repudiation of which it was unaware.

It is true, of course, that, where one party to a contract repudiates its obligations thereunder, the other party may either treat the contract as terminated or, alternatively, affirm the contract, and, if the latter option is chosen, the nonrepudiating party is deemed to remain obligated to perform under the contract (*see e.g. Strasbourger v Leerburger*, 233 NY 55, 59; *Rubber Trading Co. v Manhattan Rubber Mfg. Co.*, 221 NY 120, 126; *Hadfield v Colter*, 188 App Div 563, 577; 22A NY Jur 2d, Contracts §§ 448-451). In order to be deemed to have made such an election, however, the nonrepudiating party must have had knowledge of the repudiation, since "[e]lection presupposes knowledge, or at least the omission to fulfill some duty of inquiry from which knowledge would have followed" (*Richard v Credit Suisse*, 242 NY 346, 352; *see also* Restatement § 246 [1]; 13 Williston, Contracts § 39:34, at 650-652 [4th ed]). Thus, a party loses an affirmative defense of excuse for breaching a contract only where the party continues to carry out the contract "in spite of a *known* excuse" for nonperformance (*Thuman v Clawson & Wilson Co.*, 211 App Div 507, 510 [emphasis added]).

Nor, if the issue is viewed as one of waiver, can the right to defend on the ground of the other party's repudiation be waived without knowledge of the repudiation. It is fundamental that "[w]aiver requires the voluntary and intentional abandonment of a *known* right which, but for the waiver, would have been enforceable" (*General Motors Acceptance Corp. v Clifton-Fine*

*Cent. School Dist.*, 85 NY2d 232, 236 [emphasis added]; *see also United Commodities-Greece v Fidelity Intl. Bank*, 64 NY2d 449, 457; 13 Williston, Contracts § 39:22, at 591-592; 8 Corbin, Contracts § 40.11, at 562-563 [1999 rev ed]).

In this case, without knowing of CPU's repudiation, Mobil obviously could not have known that it had a right to treat its future obligations under the Endorsement Agreement as discharged by that repudiation. So long as Mobil remained ignorant of its right to deem its obligations under the Endorsement Agreement to be discharged, it could not waive that right. By the same token, without knowledge of CPU's repudiation, Mobil could not make an election whether or not to keep the Endorsement Agreement alive in the face of that repudiation.

Although CPU emphasizes that Mobil was aware that CPU had entered into a distribution agreement with MicroSource, the uncontroverted evidence establishes that Mobil did not know, at any time prior to its termination of the Endorsement Agreement in March 1992, of the provisions of the MicroSource Agreement that rendered it a repudiation of CPU's pricing obligations under the Endorsement Agreement. Indeed, the evidence shows that, in response to Mobil's inquiries about the MicroSource Agreement, CPU specifically concealed from Mobil the provisions of the MicroSource Agreement that gave MicroSource complete control over the price at which Servistat would be offered. As previously discussed, Stern of CPU, in his November 5, 1991 letter to Mobil, backed out of his agreement to provide Mobil with a copy of the MicroSource Agreement, but stated that CPU would "discuss with [Mobil] those sections of the [MicroSource Agreement] which impact the Mobil-CPU relationship," including what Stern misleadingly referred to as a "provision for Mobil pricing." In opposing Mobil's motion for summary judgment, CPU failed to present any evidence that, at any time prior to Mobil's termination of the Endorsement Agreement in March 1992, it disclosed to Mobil the fact that the MicroSource Agreement gave MicroSource unfettered power to determine pricing for Servistat. Thus, no triable issue exists as to whether Mobil knew that its obligations under the Endorsement Agreement were excused during the period from October 1991 to March 1992. Plainly, Mobil had no such knowledge at that time.

CPU cites only one case in which a defendant was held to have lost its right to assert the plaintiff's repudiation as an affirmative defense, notwithstanding the defendant's ignorance of the repudiation. Contrary to CPU's contentions, however,

that 83-year-old decision (*Rosenthal Paper Co. v National Folding Box & Paper Co.*, 226 NY 313) does not stand for the illogical proposition that a party to a contract waives any right to invoke the other party's secret repudiation as a defense unless the nonrepudiating party acts immediately after the repudiation. Rather, *Rosenthal* holds that, where one party repudiates an agreement by rendering itself incapable of performing an essential duty owed thereunder, and keeps the repudiation secret from the other party for the remainder of the term of the contract, the other party's right to terminate survives until the contract expires by its terms, but no longer. It is clear from the opinion in *Rosenthal* that it was crucial to the Court of Appeals' decision that the defendant, the licensee of a patent, had continued to use the patent from the time of the licensor's repudiation of his contractual obligation to protect the patent from infringement (which the licensor did by secretly assigning the patent to the plaintiff, a third party) until the expiration of the term of the license agreement (*see id.* at 323-324). Thus, *Rosenthal* is of no assistance to CPU in this case, since Mobil terminated the Endorsement Agreement nearly two years before the Agreement, by its terms, would have expired.

*Rosenthal* is further distinguishable from this case in that, according to the *Rosenthal* decision, the original licensor under the license agreement at issue, who had repudiated the license agreement by assigning the licensed patent to a third party, "did not violate a legal obligation or duty in keeping [the assignment] unknown to the [licensee]" (*id.* at 325). Here, by contrast, when Mobil reminded CPU that its arrangement with MicroSource "should ensure compliance with your contract with Mobil" and requested that CPU honor its prior agreement to send Mobil a copy of the MicroSource Agreement to verify such compliance, CPU not only refused to send Mobil a copy of the contract, it misleadingly represented that the MicroSource Agreement contained a "provision for Mobil pricing." In thus responding to Mobil's reasonable inquiry with, at best, a half-truth, CPU arguably made a fraudulent misrepresentation of fact (*see Junius Constr. Corp. v Cohen*, 257 NY 393, 400; *Banque Indosuez v Barclays Bank*, 181 AD2d 447), and certainly breached the covenant of good faith and fair dealing that is implied by law in all contracts (*see* Restatement § 205).

### CONCLUSION

To recapitulate, we hold that CPU repudiated its pricing obligations under the Endorsement Agreement by entering

into the MicroSource Agreement, which divested CPU of its power to fulfill those obligations; that Mobil's subsequent termination of the Endorsement Agreement is not actionable as a breach of contract by reason of the discharge of Mobil's contractual obligations that resulted from CPU's repudiation; and that any claims based on breaches of the Endorsement Agreement Mobil may have committed prior to CPU's repudiation are barred by the statute of limitations. Further, Mobil's failure to terminate the Endorsement Agreement immediately after CPU's repudiation did not constitute an election to go forward with the contract notwithstanding the repudiation, since it is undisputed that Mobil had no knowledge of the repudiation at the relevant time. Since the foregoing is sufficient to require us to affirm the grant of Mobil's motion for summary judgment dismissing the complaint, it is unnecessary for us to reach Mobil's other arguments for affirmance.

Accordingly, the judgment of the Supreme Court, New York County (Herman Cahn, J.), entered February 7, 2001, which dismissed the complaint, pursuant to an order, same court and Justice, entered January 12, 2001, granting Mobil's motion for summary judgment dismissing the complaint, should be affirmed, without costs. The appeal from the aforesaid order should be dismissed, without costs, as subsumed in the appeal from the judgment.

BUCKLEY, J.P., ELLERIN, LERNER and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, entered February 7, 2001, affirmed, without costs, and appeal from order, same court, entered January 12, 2001, dismissed, without costs, as subsumed in the appeal from the judgment.