■ JANET R. MARKS, PH.D., Respondent-Appellant, v SHARON P. SMITH et al., Appellants-Respondents. [885 NYS2d 463]—

Order, Supreme Court, New York County (Milton A. Tingling, J.), entered February 20, 2008, which denied the parties' respective motions for summary judgment, modified, on the law, to grant defendants' motion in its entirety, the complaint dismissed, and otherwise affirmed, with costs. The Clerk is directed to enter judgment in favor of defendants accordingly.

In 1996, plaintiff and defendant Fordham University entered into a written agreement, entitled "Faculty Contract," under which Fordham appointed plaintiff to a two-year, tenure-track associate professorship in the Faculty of Business, subject, however, to the following proviso: "Faculty member will be serving as Associate Dean for Academic Affairs for the Faculty of Business. The term of appointment of this contract will be suspended until full-time faculty status begins. Salary will be paid as an administrator and not on a faculty line until full-time faculty status begins." The contract (which does not contain a merger clause) fails to specify any rate of salary for either the administrative position or the faculty position. Neither does the contract specify the time of plaintiff's transfer from administrative to faculty status, or the events that would trigger that transfer.

From 1996 until early 2002, plaintiff served as an associate dean; in 2002, her annual salary was $121,000. In February of 2002, plaintiff announced that she was resigning her deanship, effective March 8, 2002, and would thereupon assume her duties as an associate professor. Defendant Smith, who was dean of Fordham's Graduate School of Business Administration at all relevant times, testified that, in a conversation that took place on or about February 6, 2002, she told plaintiff that all teaching assignments for the already-commenced spring term had been filled, and therefore requested that plaintiff delay resigning her administrative position until the beginning of the fall 2002 term or, alternatively, the beginning of the summer 2002 term; plaintiff, however, refused to do so. Nonetheless, Fordham accepted plaintiff's resignation of her deanship and advised plaintiff that her faculty appointment would go into effect at the beginning of the fall 2002 term, whereupon she would receive an annual salary of $70,000. Fordham further stated that plaintiff's benefits would continue without interruption, and offered her the opportunity to teach two summer courses, for which she would receive two ninths of her faculty salary. As stated in her affidavit, plaintiff refused to teach any summer courses.

When plaintiff's resignation of her administrative position became effective in March 2002, Fordham stopped paying her salary but continued her benefits, as it had promised. Plaintiff advised Fordham that she considered the university to have breached her contract both by ceasing to pay her $121,000 administrative salary in March 2002 and by stating its intention to reduce her salary to $70,000 once she began teaching in the fall. On the basis of this position, plaintiff told Fordham in August 2002 that she was refusing to accept any teaching assignment for the fall 2002 term. By letter dated September 3, 2002, Fordham advised plaintiff that it was terminating her employment on the ground that she had breached her contract by refusing to accept a teaching assignment for the fall 2002 term. Plaintiff subsequently commenced this action against Fordham and two of its senior administrators for monetary damages and declaratory relief. On appeals by both sides from Supreme Court's denial of their respective motions for summary judgment, we modify to grant defendants summary judgment dismissing the complaint in its entirety.

Plaintiff's first cause of action seeks damages for Fordham's alleged breach of her contract "by purporting to reduce her annual salary when she relinquished her deanship position." Plaintiff's contract does not specify a rate of compensation or a method for determining compensation, nor does the contract prohibit Fordham from reducing her salary upon her transfer from administration to faculty. Accordingly, absent extrinsic evidence of a greater obligation, the contract is enforceable only to the extent it is construed to require that plaintiff's compensation be set at a rate that is reasonable in comparison with the range of compensation Fordham customarily paid to holders of comparable faculty positions during the same period (*see Kenneth D. Laub & Co. v Bear Stearns Cos.*, 262 AD2d 36 [1999]). The record establishes, as a matter of law, that Fordham satisfied this obligation. Defendant Hollwitz, Fordham's vice-president of academic affairs, testified, without contradiction, that, as a matter of general practice, a Fordham administrator who transferred to the faculty would receive a lower salary as a faculty member than he or she had received as an administrator. Hollwitz further testified that plaintiff's faculty salary was set at $70,000 because that amount "was somewhere in the middle of the distribution of Associate Professor of Management Systems salaries."

Plaintiff did not come forward with any extrinsic evidence to support her contention that Fordham, in setting her faculty salary at $70,000, breached any contractual obligation the parties

had left unstated in their written agreement. While plaintiff submitted an affidavit asserting in conclusory fashion that her own "research" showed that the "average salary" for an associate professor of business at Fordham was "nearly $75,000" during the 2001-2002 academic year, this factual claim, even if accurate, falls far short of providing a basis on which a factfinder could reasonably determine that the $70,000 annual rate at which Fordham set plaintiff's faculty salary was not reasonably consistent with the university's customary practice in compensating holders of comparable positions at the time. Since this was all that plaintiff's contract required of Fordham with regard to setting her faculty compensation, and the record establishes that this obligation was satisfied, Fordham is entitled to summary judgment dismissing the first cause of action.

Plaintiff's second cause of action seeks damages for Fordham's alleged breach of contract by "stopp[ing] pay[ment of] her annual salary beginning on March 9, 2002," the day after her last day as a dean. Plaintiff fails, however, to identify any basis in the record for a determination that Fordham was required to continue paying her an administrative salary after she voluntarily resigned her administrative position. Further, nothing in the parties' contract obligated Fordham to start paying plaintiff her faculty salary (which, as discussed above, was legitimately set at a lower rate than her administrative salary) immediately upon her relinquishment of her administrative position where, as here, plaintiff unilaterally chose to resign her deanship in the middle of the spring term, when no teaching assignments were available. In this regard, it is significant that the University Statutes, which are incorporated by reference into plaintiff's contract, establish that the primary responsibility of a Fordham faculty member is to teach. While plaintiff claims that "research and committee work," not just teaching, are part of a faculty member's job, she does not identify any particular research project or committee work that she intended to initiate or continue as a full-time faculty member upon resigning her deanship. In essence, plaintiff would have us construe the contract to require Fordham to pay her for doing nothing; this is an interpretation we decline to adopt. Considering the difficult situation that plaintiff herself created, Fordham acted reasonably in advising plaintiff, upon her resignation of her deanship, that it intended to commence her full-time faculty status at the opening of the following fall term, and accommodating her in the interim by continuing her benefits without interruption and by offering to assign her two summer courses to teach, for which she would have been paid two ninths of her annual faculty salary. Since plaintiff identifies no basis, either in the contract or

in extrinsic evidence, for imposing a greater obligation on Fordham, the latter is entitled to summary judgment dismissing the second cause of action.

Plaintiff's third cause of action seeks damages for Fordham's alleged breach of contract "by purporting to terminate her employment in September 2002." The record, however, establishes as a matter of law that Fordham was entitled to terminate its contract with plaintiff in response to her repudiation of that contract by refusing to accept any teaching assignment for the fall 2002 term, which refusal lacked any justification, as discussed above (*see Computer Possibilities Unlimited v Mobil Oil Corp.*, 301 AD2d 70, 77 [2002] [one party's repudiation of contract discharges the other party's obligations thereunder]). To the extent the third cause of action seeks damages based on Fordham's termination of plaintiff's contract without following the internal procedures for termination of a faculty member specified in the University Statutes, the claim still must fail as a matter of law because the contract provided that "[t]he term of [plaintiff's] appointment [to the faculty] will be suspended until *full-time faculty status* begins" (emphasis added). The record establishes that plaintiff never attained full-time faculty status—indeed, in August 2002, she specifically rejected the opportunity to assume such status—and she therefore was not entitled to have her termination considered through the procedures specified in the University Statutes (*cf. B. Man Yoon v Fordham Univ.*, 216 AD2d 184, 185 [1995] [reinstating tenured faculty member's cause of action against university "seeking payment of (his) salary . . . until and unless he is dismissed in accordance with . . . the university's Statutes," although reinstatement was precluded by expiration of the limitation period for a CPLR article 78 proceeding]). In any event, plaintiff has no right to hold Fordham to adherence to the disciplinary protocols of its University Statutes when the record establishes that plaintiff effectively abandoned her faculty appointment, thereby becoming the first party to breach her contract, by flatly refusing to accept any teaching assignment for the fall 2002 term.

The fifth cause of action seeks a declaration that "(a) University officials failed to terminate [plaintiff's] employment according to the procedures dictated in . . . the University Statutes; and (b) she is now and will remain a tenure-track Associate Professor in the Business School unless and until the University invokes and follows those procedures." Relief of this nature cannot be obtained through a plenary action, and must be sought by way of a proceeding pursuant to CPLR article 78

(*see Maas v Cornell Univ.*, 94 NY2d 87, 92 [1999]). Plaintiff did not commence this action until October 2004, more than two years after Fordham terminated her employment in September 2002 and long after the expiration of the four-month limitation period applicable to an article 78 proceeding (CPLR 217). Accordingly, Fordham is entitled to summary judgment dismissing the fifth cause of action (*see Risley v Rubin*, 272 AD2d 198 [2000], *lv denied* 96 NY2d 701 [2001]; *cf. B. Man Yoon v Fordham Univ., supra*). In any event, as previously discussed in connection with the third cause of action, the record establishes that plaintiff (by her own free choice) never attained the full-time faculty status required to trigger the term of her faculty appointment, and she therefore was not entitled to the benefit of the procedures provided in the University Statutes.

In her fourth cause of action, plaintiff seeks damages based on the two individual defendants' alleged tortious interference with her contractual relations with Fordham. To begin, for the reasons discussed above, the record establishes that Fordham did not breach plaintiff's contract. Since the breach of a contract is an essential element of a tortious interference claim (*see Lama Holding Co. v Smith Barney*, 88 NY2d 413, 424 [1996]), plaintiff cannot prevail on this cause of action as a matter of law. Even if there were evidence that Fordham had breached the contract, summary judgment dismissing the cause of action would still be appropriate. Plaintiff fails to identify any evidence in the record tending to show that defendants Smith and Hollwitz (who were, at the relevant times, the dean of Fordham's Graduate School of Business Administration and Fordham's vice-president of academic affairs, respectively) acted outside the scope of their employment and committed independent torts or predatory acts directed at her (*see Murtha v Yonkers Child Care Assn.*, 45 NY2d 913, 915 [1978]). Smith and Hollwitz were plaintiff's superiors, and, the dispute whether proper procedures were followed notwithstanding, there is no evidence that they were not acting on behalf of defendant university and within the scope of their authority (*see Nu-Life Constr. Corp. v Board of Educ. of City of N.Y.*, 204 AD2d 106, 107 [1994], *lv dismissed* 84 NY2d 850 [1994]) or that they were motivated by self-interest (*see Kartiganer Assoc. v Town of New Windsor*, 108 AD2d 898, 899 [1985], *appeal dismissed* 65 NY2d 925 [1985]). It does not avail to save the claim that plaintiff alleges that Smith and Hollwitz, in acting adversely to plaintiff on Fordham's behalf, were motivated by an alleged desire to retaliate against her for supporting the position of Fordham's clerical employees in a collective bargaining dispute with the university.

While our dissenting colleague takes the position that the rec-

ord establishes some breach of contract by Fordham (and would even grant plaintiff summary judgment on this point), he fails to identify any particular provision of the agreement with plaintiff—or even any alleged oral promise to her—that was breached by Fordham. Again, in early February 2002, before plaintiff resigned her administrative position (at her own instance), she was told by defendant Smith (according to Smith's uncontradicted deposition testimony) that no faculty position was available at that time, since there were no unfilled teaching assignments. Plaintiff nonetheless insisted on resigning her deanship in the middle of the spring term, rejecting Smith's reasonable request that she continue in administration until she could begin teaching, either in the fall or in the summer. These matters are all evidenced in the record by Smith's testimony.

Smith also testified (again, without contradiction) that it would have been contrary to Fordham's policy and practice to begin paying plaintiff her faculty salary before she assumed teaching duties. While the dissent points out that teaching is one of several duties of a faculty member set forth in the University Statutes, this does not change the fact that it is uncontroverted on this record that it was Fordham's established policy not to start paying a faculty member until the start of a term in which he or she commenced teaching. The dissent would have us rewrite the parties' agreement to require Fordham to apply special rules to plaintiff, and to give her uniquely favorable treatment, by paying her a faculty salary during a period of about six months (March through August 2002) in which she was not teaching any classes. This we decline to do. We would add that the invocation by plaintiff and the dissent of a faculty member's responsibilities other than teaching rings rather hollow, given that, as previously noted, plaintiff has never identified—neither in her contemporaneous writings, in her deposition testimony, nor in her written submissions in this litigation—any particular "research" project or other faculty-related activity in which she intended to engage during the interval between resigning the deanship in March 2002 and the beginning of the fall term the following September.

In the final analysis, the dissent takes the position that, once plaintiff (on her own initiative) resigned her deanship in the middle of a term, Fordham was obligated to begin paying her a faculty salary immediately, even though no teaching assignments were available and it was the school's policy not to begin a faculty appointment until the faculty member could be given a teaching assignment. Nothing in the parties' written agree-

ment supports the dissent's view that Fordham had any such obligations to plaintiff. Indeed, the dissent, by emphasizing that Fordham failed to give plaintiff "any notice whatsoever" that her administrative salary would stop when her resignation went into effect, seems to acknowledge implicitly that the parties' agreement did not require Fordham to grant plaintiff what would have been, in effect, a six-month paid vacation upon her voluntary resignation from the deanship.

The dissent asserts that, because Smith's statements to plaintiff in their February 2002 conversation were somehow "less than unequivocal," such statements provide grounds for expanding Fordham's contractual obligations to plaintiff. We do not follow this reasoning. In any event, contrary to the dissent's contention, Smith's uncontradicted testimony establishes that plaintiff—a doctorate-holding university administrator—should have well understood from her conversation with Smith in early February 2002 that, because there were no unfilled teaching assignments at that time, it was Fordham's expectation and desire that she remain in her administrative position until she could be given a teaching assignment in the fall (which was Fordham's preference) or, if plaintiff insisted on leaving the deanship earlier, in the summer. The logical implication of what Smith told plaintiff was that the latter's abrupt resignation of the deanship in March 2002 would result in the interruption of her salary.*

---

* The following excerpts from Smith's deposition testimony are representative:

"What I said to [plaintiff] was that a faculty position normally begins in the beginning of an academic year. That is the preferred time for all faculty positions to begin. If they begin midyear, then half of the teaching obligation for the entire year would still be due.

"A[s] a less preferred option, a faculty position could begin no later than the summer term for the graduate school which would accommodate a three-course teaching load which is half of the normal teaching load for Faculty of Business . . .

"My option [offered to plaintiff] was that she could be a full-time faculty member if she taught half of her—if she began it in academic year '01-'02, she would have to teach three courses in academic year '01-'02. The only possibility for teaching three courses in academic year '01-'02 would be in the summer term at the graduate school since the spring term was already underway . . .

"The other option was the normal option which would be beginning academic year '02-'03 which would begin in the fall term . . .

"I said I accepted her decision to move from administrative position to a faculty position and that would mean it would begin in academic year '02-'03 because this academic year was not only well underway, in essence the staffing was completed for the undergraduate school because we were already into the

In closing, we note that the routine administrative actions by Fordham of which plaintiff complains—such as sending plaintiff an August 8, 2002 letter (which followed "numerous unsuccessful attempts to contact [her]") setting forth her class assignments for the forthcoming fall term—are not rendered "egregious" by the dissent's so characterizing them. We also disagree with the dissent's evident view that the support for plaintiff's position lacking in the parties' written agreement (or even in any alleged oral promise) can be supplied by the gracious remarks about plaintiff made by defendant Smith in a February 22, 2002 memorandum she issued to personnel of the School of Business (e.g., "the attractions and challenges of research have lured [plaintiff] to leave administration for the full time faculty life"). We decline to punish an employer for speaking about an employee with generosity and civility. Concur—Friedman, J.P., Nardelli and DeGrasse, JJ.

Catterson, J., dissents in a memorandum as follows: I must respectfully dissent because defendants Smith and Hollwitz both acknowledged and, in Smith's case, lauded the plaintiff's decision to move to her faculty position to conduct research "effective March 9, 2002" but stopped her salary as of the same date without any notice whatsoever to the plaintiff. In my opinion, by so doing the defendants breached the plaintiff's employment contract on March 9, 2002. Thus, she was not contractually obligated to accept any of the classes assigned to her on August 8, 2002, five months after the cessation of payment of her salary.

Moreover, in my opinion, the defendants' explanation that the plaintiff's salary would be resumed on September 1, 2002 because that was the start of the new academic year was as nonsensical as it was egregious, if by that defendants meant she would be compensated as of September 1. The plaintiff was informed of her assigned classes in a memo dated August 8, 2002. The memo also informed her that classes started on August 28, 2002. The memo therefore appears to assume that plaintiff not only would teach four days' worth of scheduled classes but would engage in the required preparation for those classes prior to August 28th without any compensation whatsoever.

The plaintiff's faculty contract clearly states: "Salary will be paid as an administrator and not on a faculty line until full-time faculty status begins." The majority bases its determination that the stoppage of salary is not a breach of contract by

---

spring term . . . We were into the second trimester of the graduate school. The only thing left was the third [summer] trimester of the graduate school."

the University on its view that the plaintiff's full-time faculty status could not begin until plaintiff commenced teaching classes. Consequently, the majority finds that once the plaintiff decided to relinquish her administrative position, which decision was acknowledged and accepted, she was rightfully deprived of a salary because she could not be assigned to teach classes midsemester.

In my opinion, the teaching of classes as a condition for a full-time faculty position is neither stated in the one-page contract nor is it reflected in the record containing the incorporated University Statutes on policies and procedures. In fact, the relevant *section in the Statutes on responsibility of faculty* lists eleven responsibilities of faculty ranging from (1) "[s]atisfactory fulfillment of teaching duties in assigned courses or their equivalents" through (11) "[c]ooperation in the observance of University regulations." In between are nine other responsibilities that do not relate to teaching classes. For example, (6) relates to "[i]nvolvement in significant scholarly research"; (7) relates to "[s]cholarly publication"; (8) refers to "[p]articipation in learned societies and professional organizations." The chapter does not state that a faculty member *must* engage in each and every responsibility listed in any given semester, nor does it specify that engaging in any one of the enumerated responsibilities is mandatory in each and every semester.

As for teaching requirements, chapter three, § 4-03.02 of the Statutes provides only that: a faculty member *may not exceed*, in any year, an average of three courses per semester; that a modification of this teaching load "shall be approved by the Dean and the Vice President for Academic Affairs"; and that the course load "may be reduced for individual faculty members engaged in major research projects."

Hence, it could not be clearer that there is abundant flexibility as to the required faculty responsibility of teaching classes in any one semester. Indeed, the Statutes clearly indicate that a teaching load can be modified and/or reduced (with no stated minimum) simply by approval from the dean and vice-president for academic affairs; and moreover that it can be done so for faculty members engaged in research.

In this case, the letters and memos from defendant Smith, the *dean* of the Graduate School of Business Administration, and from defendant Hollwitz, the *vice-president of academic affairs*, responding to the plaintiff's February 6, 2002 letter establish precisely that: both the requisite approval of the necessary administrators, as well as an indication that research is the faculty responsibility in which plaintiff was to engage upon moving to her faculty position.

The sequence of memos and letters following the plaintiff's letter were as follows: First, she received a memo dated February 8, 2002, from Smith in which Smith acknowledged the plaintiff's request to "move *to your* faculty position" (emphasis added). The one paragraph memo continued: "As I have already indicated in our conversations, I accept your decision" (emphasis added) and ended with the sentence: "Your faculty appointment and its timing will be set from [*sic*] [the] Vice President for Academic Affairs office."

On February 12, 2002, the plaintiff replied that there was no need to wait for either the appointment or its timing since she was already appointed to the faculty. In my opinion, this was a correct observation since her one page "Faculty Contract" signed on November 25, 1996 states that: "Fordham University hereby appoints Janet Marks to the faculty of the University." The contract further specifies that her faculty rank is associate professor in the Faculty of Business. The contract includes a section titled *"Special Provisions: Faculty member will be serving as* Associate Dean for Academic Affairs for the Faculty of Business . . . Salary will be paid as an administrator and not on a faculty line until full-time faculty status begins" (emphasis added). The last paragraph of the contract preceding the plaintiff's signature states: "I hereby accept this appointment as a member of the faculty of Fordham University."

The contract provides that the term of her appointment as a full-time faculty member, which puts her on a tenure track with a seven year probationary period from the date of the appointment will be suspended until she assumes full-time faculty status. However, the contract notably omits any prohibitions or restrictions as to the timing of her assumption of a full-time faculty position.

In any event, within 10 days of the plaintiff's letter, wherein she drew defendant Smith's attention to these contractual provisions, Smith issued a memo on February 22, 2002 to "All Faculty, Administrators and Staff." The memo stated, in relevant part: "[I]t is not surprising that the attractions and challenges of *research* have lured one of our administrators to leave administration for the full-time faculty life. Janet Marks, who was appointed Associate Dean for Academic Affairs and Administration *and* Associate Professor in Management Systems in 1996, has decided to leave her dean's post and move to faculty effective March 9, 2002. I am certain that you join me in expressing appreciation . . . and wish her fulfillment and happiness as she dedicates her energies to *research* and teaching" (emphasis added).

Three days later, on February 25, 2002, defendant Hollwitz wrote the plaintiff a one-paragraph letter stating: "I write to acknowledge your decision to move from your administrative position as associate dean to your faculty position as associate professor effective March 9, 2002. Your salary effective for the academic year 2002-03 will be $70,000. You have the option to earn as much as two-ninths of this amount during this academic year if you choose to teach as many as two courses during the summer term."

In both latter written communications of acknowledgment, the date of the plaintiff's move to a faculty position was noted as "effective March 9, 2002." There could be no clearer acceptance, acknowledgment or approval of the plaintiff's move to full-time faculty status as of that date. Further, none of the written communications memorialized any objections by the defendants or referenced any difficulties caused by the plaintiff in choosing to make her move midsemester.

Therefore, the majority's reliance on an initial conversation that the plaintiff engaged in with defendant Smith prior to submitting her letter of February 6, 2002, is misguided. In any event, I believe the majority mischaracterizes defendant Smith's deposition testimony as to that conversation. There is simply no testimony where defendant Smith claims to have unequivocally told the plaintiff that "no faculty position was available at that time, since there were no unfilled teaching assignments." Nor is there any testimony as to the plaintiff "rejecting Smith's reasonable request that she continue in administration until she could begin teaching, either in the fall or in the summer."

On the contrary, the record reflects that, in her deposition, Smith testified as follows as to her reaction upon being told of plaintiff's decision to move to the faculty appointment: "I raised no objection to that decision, understood her appointment allowed for that decision with a faculty line to be held for her but questioned the timing of the decision with an understanding of the time involved in searching for a replacement and the timing of the issues that were involved in her position as dean."

Throughout her deposition, again and again, defendant Smith testified in less than unequivocal terms such as: "preferring" the plaintiff to move to faculty at the beginning of the academic year; that moves to faculty "normally" occurred at the beginning of an academic year; and that Smith's concern was that "I had no understanding of how [a faculty position] could begin at any other time" and "expected that the move would therefore coincide with that sort of timing." Indeed, on being asked: "Did you say 'No, you can't do that?'," Smith replied: "No."

Moreover, Smith did not testify that she told the plaintiff that her salary would be stopped if she moved to a faculty position midsemester, and nothing in her deposition testimony indicates that she informed the plaintiff that university policy and procedure required the plaintiff to make a move only at the beginning of an academic year. However, within just a week of their memos, the defendants unilaterally and without notice stopped the plaintiff's salary payments entirely as of March 9, 2002—a fact that the plaintiff did not become aware of until March 26, 2002 when she memorialized the fact in her next communication to the Office of Academic Affairs.

It was only after this query letter about the salary stoppage that defendant Smith, who had lauded the plaintiff's plans to assume a faculty position effective March 9, 2002, for the purpose of *research*, attempted to explain why the plaintiff's regular faculty salary had been stopped. In the letter of April 5, 2002, Smith wrote: "Since you requested that the change occur in mid-semester, it was not possible to assign you ordinary teaching responsibilities for the Spring 2002 term. Therefore, your regular faculty salary will resume . . . September 1, 2002."

In my opinion, the plaintiff's letter of May 23, 2002 correctly observed that the defendants had breached the contract. In response, on June 3, 2002, Smith stated disingenuously, "You will note that the University did not refuse to accept your own timetable . . . and [did not] claim that you breached your employment contract if you refused to continue your administrative duties until the Fall 2002." The obvious conjecture to be made here is that the University did not so claim because it could not so claim, given that the contract is silent as to the method and timing of any transition by the plaintiff. Nowhere does the record reflect defendants' plea that she continue her administrative duties, much less that she refused such plea.

That defendant Smith states that the University did not claim a breach of contract by plaintiff, yet without notice stopped her salary is an incomprehensible and egregious position. Thus, in my opinion, the defendants were in breach of contract as a matter of law, and therefore summary judgment should be granted to the plaintiff on liability with a remand on the amount of damages to be awarded.