[861 NE2d 69, 828 NYS2d 254]

MADISON AVENUE LEASEHOLD, LLC, Appellant, v MADISON BENT-
LEY ASSOCIATES LLC, et al., Respondents.

Argued November 16, 2006; decided December 19, 2006

**POINTS OF COUNSEL**

*Kucker & Bruh LLP,* New York City (*Catherine A. Helwig, Nativ Winiarsky, Alan D. Kucker* and *Patrick K. Munson* of counsel), for appellant. I. The Appellate Division majority opinion improperly focused on the legal consequences of Madison Bentley Associates LLC's monetary defaults under the lease instead of the separate legal consequence of such defaults expressly stated in the guaranty. (*Fifty States Mgt. Corp. v Pioneer Auto Parks,* 46 NY2d 573; *American Trading Co. v Fish,* 42 NY2d 20; *Raven El. Corp. v Finkelstein,* 223 AD2d 378, 88 NY2d 1016; *Anderson Credit & Leasing Corp. v McEvoy,* 236 AD2d 569; *Pollina v Blatt,* 262 AD2d 384; *Chemical Bank v PIC Motors Corp.,* 58 NY2d 1023; *United States v Beardslee,* 562 F2d 1016.) II. Contrary to the Appellate Division majority opinion, the guaranty was in full force and effect during the first three years. III. The Appellate Division majority wrongly speculated as to the intent of the parties and then considered that speculative intent in interpreting the terms of the unambiguous guaranty. (*South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272; *Matter of Wallace v 600 Partners Co.,* 86 NY2d 543.) IV. The Appellate Division majority improperly considered factual matters outside the unambiguous guaranty to interpret its meaning and effect. (*South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272.) V. The Appellate Division's finding that Madison Bentley Associates LLC's monetary defaults were "extinguished" or nullified by waiver is without support under New York law. (*Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.,* 61 NY2d 442; *Louis Dreyfus Energy Corp. v MG Ref. & Mktg., Inc.,* 2 NY3d 495.) VI. The courts below should have granted Madison Avenue Leasehold, LLC (Madison) permission to amend its complaint to make clear that Madison had distinct claims against Madison Bentley Associates LLC and Arthur and Brian Miller. (*Cooper v Met Merchandising,* 75 AD2d 519; *McCaskey, Davies & Assoc. v New*

*York City Health & Hosps. Corp.,* 59 NY2d 755; *Igbara Realty Corp. v New York Prop. Ins. Underwriting Assn.,* 104 AD2d 258.)

*David Vanderpool,* New York City, and *Seymour I. Hurwitz* for respondents. I. The majority correctly found that Madison Avenue Leasehold, LLC could not proceed against Arthur and Brian Miller under the limited guaranty due to the absence of default by Madison Bentley Associates LLC. (*Terwilliger v Terwilliger,* 206 F3d 240; *Weissman v Sinorm Deli,* 88 NY2d 437; *Bankers Trust Hudson Val., N.A. v Christie,* 68 AD2d 969; *South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272; *Vermont Teddy Bear Co. v 538 Madison Realty Co.,* 1 NY3d 470; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.,* 257 AD2d 1; *Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.,* 61 NY2d 442; *Montant v Moore,* 135 App Div 334; *Lee v Wright,* 108 AD2d 678; *Atkin's Waste Materials v May,* 34 NY2d 422.) II. The parties intended the limited guaranty to terminate after the first three years of the lease. (*Vermont Teddy Bear Co. v 538 Madison Realty Co.,* 1 NY3d 470; *Community Natl. Bank & Trust Co. of N.Y. v Cognetta,* 88 AD2d 897; *Chase Manhattan Bank, N.A. v American Natl. Bank & Trust Co. of Chicago,* 93 F3d 1064; *Louis Dreyfus Energy Corp. v MG Ref. & Mktg., Inc.,* 2 NY3d 495.) III. The majority opinion properly considered the terms of the lease in interpreting the limited guaranty. (*Matter of Wallace v 600 Partners Co.,* 86 NY2d 543; *Port Distrib. Corp. v Pflaumer,* 880 F Supp 204; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.,* 257 AD2d 1; *Greene's Ready Mixed Concrete Co. v Fillmore Pac. Assoc. Ltd. Partnership.,* 808 F Supp 307; *Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.,* 61 NY2d 442.)

## OPINION OF THE COURT

GRAFFEO, J.

In this action brought by a landlord to collect on a personal guaranty signed by two individuals, the issue is whether a tenant who paid monthly rent but did so in an untimely manner was in "monetary default" under the terms of the lease and guaranty. Based on the particular language chosen by the parties in these documents, we conclude that the late payment of rent in this case did not constitute a "monetary default."

Plaintiff, Madison Avenue Leasehold, LLC, is the owner of a building at 437 Madison Avenue in New York City. Through an agent, plaintiff entered into a lease agreement, dated March 29,

2000, with the assignor of defendant, Madison Bentley Associates LLC. The lease was for a 10-year term to commence as soon as the landlord completed specified renovation work. The lease authorized the tenant to use the premises only for a Rolls Royce and Bentley automobile dealership. A rider to the lease provided for graduated increases in rent on an annual basis, with "rent . . . payable in equal monthly installments in advance on the first day of each calendar month, without notice or demand."

On the same day the lease was signed, the principals of the tenant—defendants Arthur and Brian Miller—executed a personal guaranty in favor of the landlord. The obligation of the Millers as guarantors would arise

> "if Tenant should default in the performance and observance of any of the terms, covenants, provisions or conditions contained in the Lease, and if such default shall not be cured within ten (10) days after notice of such default shall have been given to Guarantor, then the Guarantor shall and will forthwith pay such rent to Landlord and any arrears thereof."

Although the total value of the 10-year lease was about $5.6 million, the liability of the guarantors was limited to close to $1.7 million unless the tenant remained on the premises after the lease term expired, in which case the guarantors would also be liable for holdover costs. Thus, absent a holdover at the end of the 10-year term, the personal guaranty covered approximately 30% of the total lease value.

The guaranty further contained an early termination clause, which provided that the obligations of the guarantors would cease at the conclusion of three years "in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the term of the Lease." According to the Millers, they agreed to sign the personal guaranty because they anticipated that their obligations under the agreement would expire after three years. They maintain that the three-year primary guaranty period was intended to correspond with the term of a separate rent subsidy agreement between the tenant and Rolls Royce and Bentley Motor Cars Inc., by which the latter agreed to reimburse about 50% of the tenant's rent for three years if the tenant opened and operated a Rolls Royce and Bentley showroom at 437 Madison Avenue.

The landlord completed the agreed-upon work in June 2000 and the tenant took occupancy on June 15, 2000. Pursuant to a

lease provision, the tenant was relieved of its obligation to pay rent for the first $3^{1}/_{2}$ months and therefore began paying rent in October 2000. For the next three years, the tenant paid rent each month but routinely did not do so by the first of the month as the lease required. The landlord accepted the rent without objection, neither complaining about the timeliness of payments nor seeking rent from the Millers under the personal guaranty. In August 2003, with the rent subsidy from Rolls Royce and Bentley about to expire, the tenant met with the landlord and requested either a rent reduction or permission to sell other makes of automobiles from the Madison Avenue showroom. Unable to obtain either concession, the tenant vacated the leased premises in September 2003 and did not pay rent for October 2003 or any month thereafter.

The landlord commenced this action against the tenant and the Millers in January 2004, asserting that the tenant's vacatur of the leased premises after only $3^{1}/_{4}$ years breached the 10-year lease and that it was entitled to damages in the amount of the rent that would have been due from October 2003 to the end of the lease term in June 2010, reduced to present value. The tenant and the Millers answered, denying the allegations. Before discovery, the landlord moved for permission to file an amended complaint. Although relying on the same facts and essentially raising the same claims as the original pleading, the amended complaint separated the causes of action against the tenant from those against the Millers, clarifying that the landlord was claiming that the tenant breached the lease and that the Millers were liable under the guaranty for the tenant's defaults, both past and present. The landlord cited the prior untimely payments of rent as constituting monetary defaults under the lease, which prevented the early termination of the guaranty after three years. Hence, the landlord argued that the Millers remained liable under the guaranty when the tenant prematurely vacated the premises.

The Millers opposed the motion to amend and cross-moved for summary judgment dismissing the complaint, contending that they could not be held personally liable because the guaranty expired at the conclusion of three years under the early termination clause and the Millers' obligations thereunder ceased in June 2003—$3^{1}/_{2}$ months before the tenant breached the lease. Objecting to the landlord's characterization of the tenant's rent payments as untimely, the Millers maintained that the tenant was never in default under the lease, or in monetary

default under the guaranty, during the first three years of the lease term. In the alternative, the Millers argued that, by repeatedly accepting the rent without raising late payment as an issue, the landlord waived the right to later declare the tenant to have been in default based on the untimely payments.

Responding to the Millers' cross motion, the landlord asserted that the untimely payments of rent amounted to numerous defaults under the lease and monetary defaults as described in the guaranty, precluding expiration of the guaranty pursuant to the early termination clause. The landlord denied that it had waived the right to demand payment on the first of every month but, even if it had, it claimed that various "no waiver" provisions in the lease and guaranty precluded a course of conduct between the landlord and tenant from resulting in waiver of the landlord's right to strictly enforce the terms of the guaranty.

Supreme Court granted the Millers' cross motion for summary judgment dismissing the complaint and denied plaintiff's motion to amend the complaint as academic. The court reasoned that, by accepting the tenant's rent payments when they were made without objecting to tenant's payment practices, the landlord had acquiesced in the late payment of rent and waived its right to declare the payments to be untimely or a default under the terms of the lease. As a result, the court concluded that there was no "monetary default" within the first three years of the lease term and, by operation of the early termination clause, the Millers were relieved of any obligation under the guaranty before the tenant breached the lease by vacating the premises.

A majority at the Appellate Division affirmed, concluding that, even assuming that a default under the lease is synonymous with a "monetary default," the landlord's repeated acceptance of late payments extinguished or waived any default as a matter of law. One Justice dissented, primarily relying on the "no waiver" clause in the guaranty in determining that no course of conduct between the landlord and tenant could have waived the landlord's right to extend the guaranty to the full 10-year term in the event that conduct on the part of the tenant amounted to a "monetary default" during the first three years of the lease. Finding the late payments during that time frame equivalent to monetary defaults, the dissent would have denied the Millers' motion for summary judgment and granted the landlord's motion to amend the complaint. The Appellate Division granted the landlord's motion for leave to appeal and we

now affirm, although our analysis differs from that of the Appellate Division majority.

It is undisputed that the tenant's vacatur of the premises in the fall of 2003 breached the lease. Because this breach occurred more than three years into the lease term, the landlord could not rely on it to defeat the early termination clause in the guaranty. Instead, the landlord cited the tenant's repeated failure during the first three years of the lease to pay rent by the first of the month as the lease required as grounds for declaring a monetary default that occurred during the first three years of the guaranty.

An agreement to pay rent on a certain date is generally a material term of a lease. As we explained in *Fifty States Mgt. Corp. v Pioneer Auto Parks* (46 NY2d 573, 578 [1979]):

> "A covenant to pay rent at a specified time . . . is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord. Often the landlord relies on timely payment of rent to meet its own outstanding obligations, such as a mortgage on the demised premises."

Thus, in *Fifty States*, where the tenant failed to pay rent for two months and did not promptly cure this deficiency even after the landlord gave notice of default, we found an acceleration clause to be enforceable, noting that the tenant might have been entitled to equitable relief if it had timely cured the default by paying the rent.

But here the issue is not whether the tenant's failure to pay rent breached a material term of the lease. Rather, the salient inquiry is whether the conduct constituted a "monetary default" that defeated the early termination clause in the guaranty. The early termination clause provides:

> "Landlord hereby agrees that in the event Tenant shall not have been in *monetary default under the Lease* at any time during the first three (3) years of the term of the Lease, this Guaranty and Guarantor's obligations hereunder shall cease and terminate upon the third (3rd) anniversary of the Commencement Date" (emphasis added).

The guaranty does not define the term "monetary default." However, another provision of the guaranty declares that "[a]ll terms in this Guaranty which are defined in the Lease shall

have the same meanings when used in this Guaranty." Although the landlord urges that the guaranty and lease are separate documents with distinct obligations and that we should not rely on terms in the lease to determine whether the guaranty is enforceable, the fact remains that the guaranty cross-references the lease and, by its plain language, the early termination clause in the guaranty is triggered by the absence of a "monetary default under the Lease." To assess whether the early termination clause was defeated, as the landlord contends, we must determine whether the tenant's repeated failure to pay rent on the first of the month amounted to a "monetary default under the Lease."[1]

When interpreting language in a commercial lease, we apply our well-established precedent concerning the construction of commercial contracts, where we have explained that

> "when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms . . . This principle is particularly important in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length . . .

> "[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face" (*South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 277-278 [2005] [internal quotation marks and citations omitted]; *see also Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]).

Although the lease here does not expressly define the phrase "monetary default," this terminology appears in lease paragraph 17, crafted by the parties, entitled "Default," which provides:

> "If Tenant defaults in fulfilling any of the covenants of this lease including the covenants for the payment of rent or additional rent . . . and if such default or omission shall continue for seven (7) days

---

1. In this regard, we deviate from the analytical path of the Appellate Division, which assumed for purposes of argument that late payment of rent was a default under the lease and that such a default was the equivalent of a "monetary default."

in the event of a default in the payment of fixed rent, additional rent or other charges payable hereunder and twenty (20) days in the event of any other default . . . after Owner shall have given to Tenant a written notice specifying such default or omission, or in the case of a happening of a default or omission . . . which cannot with due diligence be completely cured or remedied within said twenty (20) day or such shorter specified period, and if Tenant shall not have diligently commenced curing such default within such twenty (20) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written three (3) days notice of cancellation of this lease upon Tenant, and upon the expiration of said three (3) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such three (3) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as hereinafter provided.

"Notwithstanding the foregoing, in the event that a default in the payment of fixed rent, additional rent or other charges payable hereunder shall remain uncured after the expiration of the aforesaid seven (7) day period, Owner may not serve the aforementioned written three (3) day notice unless and until Owner shall have served a second notice of such *monetary default*, and such *monetary default* shall remain uncured for three (3) days after Owner shall have served such second notice" (lease paragraph 17, including inserts 4 and 4A from lease attachment [emphasis added]).[2]

In the event of a default in the payment of rent, paragraph 17 requires the landlord to notify the tenant of the default and, after receipt of the notice, the tenant will have seven days to cure

**2.** The parties crafted this lease by combining the Standard Form of Store Lease created by The Real Estate Board of New York with numerous amendments, an attachment, a rider, several schedules and other documents. Lease paragraph 17 was itself an amalgam of elements of the form lease, with substantial amendments and the addition of language set forth in an attachment drafted by the parties.

the deficiency. Even if the default is not cured within seven days of the notice, the lease provides that the landlord must send another notice giving the tenant three additional days to cure, meaning that the tenant has 10 days after it receives the first notice from the landlord to remedy any deficiency relating to the payment of rent. This provision clearly distinguishes between a default in the payment of rent and other types of defaults, with the former referred to at the end of the provision as a "monetary default" under certain circumstances.[3]

Nothing in the language of the lease suggests that rent that was paid in full each month, albeit in an untimely manner, would nonetheless fall within the category of "monetary default." To the contrary, it appears that a default in the payment of rent does not ripen into a "monetary default" until the landlord has first served a notice of default and the default has "remain[ed] uncured" for at least seven days because it is only in that context that a default in the payment of rent is characterized as a "monetary default."

This interpretation is consistent with a commonsense reading of the phrase for, absent an explicit definition to the contrary, the use of the modifier "monetary" to describe the type of default that would trump the early termination clause suggests that the parties contemplated a deficiency that involves a loss of money. When monthly rent was tendered in full and the landlord accepted it without declaring a default and before any cure period was initiated, we have no basis to presume that the landlord has suffered economic loss.

In this case, despite the tenant's failure to meet its obligation to forward the rent by the first of the month, the rent was paid each month and the landlord accepted the rent without issuing a single notice of default complaining of late payment. As a result, the tenant's initial seven-day opportunity to cure was never triggered and the deficiency never rose to the level of a "monetary default" under the terms of the lease. The parties surely could have constructed a lease or guaranty that would

---

3.  This factor, among others, distinguishes this case from *HK New Plan Marwood Sunshine Cheyenne LLC v Onofrey Food Servs., Inc.* (846 NE2d 318 [Ind 2006]), on which the landlord relies. The efficacy of the early termination clause in the guaranty at issue in *HK New Plan* did not turn on whether the tenant had been in "monetary default." Rather, the early termination clause could be defeated by any "default" on the part of the tenant and the lease explicitly defined the late payment of rent as a "default." The court in *HK New Plan* therefore had no occasion to interpret the phrase "monetary default" in a guaranty or lease comparable to this one.

have deemed any late payment a "monetary default," but they did not do so here.

This construction of the lease is also consistent with the cure provisions in the guaranty. There, the Millers guaranteed "the full and prompt payment of all rent" and agreed "that if default shall at any time be made by Tenant in the payment of any rent . . . and if such default shall not be cured within ten (10) days after notice of such default shall have been given to Guarantor, then the Guarantor shall and will forthwith pay such rent to Landlord." In accordance with the guaranty, even after the landlord notifies the guarantors of the deficiency, the tenant would have 10 days to forward the rent—thereby curing the default—before the guarantors would be obligated to pay rent on the tenant's behalf. Interpreting late rent payments as "monetary defaults" under the lease would allow the landlord, in effect, to avoid giving either the tenant or the Millers the benefit of the contractual opportunities to cure which they were entitled to under the lease and guaranty. It would render the late payment of rent an incurable "monetary default" despite the fact that it is clear from the lease and guaranty that there is a distinction between a "default" and a "monetary default" and that defaults in the payment of rent are curable if remedied within the appropriate cure period.

Because there was no "monetary default under the Lease," the early termination clause of the guaranty remained in full force and effect such that the guaranty expired by its terms on the third anniversary of the commencement of the lease term in June 2003. Since the tenant did not prematurely vacate the premises until 3½ months later, the Millers could not be held liable for that breach and were therefore entitled to summary judgment dismissing the complaint.

Our conclusion that there was no "monetary default" by the tenant renders academic the landlord's argument based on the "no waiver" clauses in the lease and guaranty.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, READ, SMITH and PIGOTT concur.

Order affirmed, etc.