■ ECHOSTAR SATELLITE L.L.C., Appellant, v ESPN, INC., et al., Respondents. [914 NYS2d 35]—

Judgment, Supreme Court, New York County (Ira Gammerman, J.H.O.), entered May 12, 2010, dismissing the complaint, and bringing up for review an order, same court and Judicial Hearing Officer, entered March 23, 2010, which, inter alia, denied plaintiff's motion for summary judgment and granted defendants' motion for summary judgment dismissing the complaint, unanimously modified, on the law, to vacate the grant of summary judgment to defendants, and to direct that the motion be denied, and otherwise affirmed, without costs. Appeal from the March 23, 2010 order unanimously dismissed, without costs, as subsumed in the appeal from the judgment. Order, same court and Judicial Hearing Officer, entered April 21, 2009, which, insofar as appealed from as limited by the briefs, granted defendants' motion for summary judgment on the liability portion of their counterclaim for interest owed as a result of plaintiff's untimely payments under the agreements, unanimously affirmed, without costs.

This dispute centers around a series of three substantially similar licensing agreements, effective September 2005, between plaintiff EchoStar Satellite, L.L.C., on the one hand, and certain

subsidiaries of the Walt Disney Company (Disney),* on the other. EchoStar, which operates a direct broadcast satellite system under the trade name "DISH Network," broadcasts television programming that it licenses from content providers such as Disney. One of the contracts authorized EchoStar to transmit the Disney Channel, Toon Disney and SOAPnet, programming created by defendants ABC Cable Networks Group, Inc. and SOAPnet, LLC. Another contract licensed to EchoStar the right to broadcast ABC Family, a network owned by defendant International Family Entertainment, Inc. A third agreement governed EchoStar's right to transmit ESPN and ESPN2 in both standard and high definition, as well as ESPNEWS, ESPNU, ESPN Classic and ESPN Deportes, all of which are operated by defendants ESPN, Inc. and ESPN Classic, Inc.

EchoStar claims that Disney breached the agreements by refusing to provide to EchoStar the high definition version of programming carried by the networks named in the agreements. However, inasmuch as the ESPN agreement expressly provided that EchoStar would be furnished the high definition versions of programming offered on ESPN and ESPN2, there is evidence that during the parties' negotiations Disney's attempts to exclude future high definition programs were rejected by EchoStar, and there is further evidence that other television providers may receive high definition programming from Disney at no additional cost, we are unable to conclude, as a matter of law, that the contracts were unambiguous as to the parties' intentions with regard to future high definition programming.

Likewise, EchoStar's contention that the contracts unambiguously provide that it bargained for and obtained the right to distribute all of the high definition "feeds" of the licensed networks is also unpersuasive, if for no other reason than that the word "feed" is not defined in the contract, and in the context presented, is not readily susceptible to one meaning. Further, while schedule A of the ESPN agreement does not contain a separate rate card for high definition programming, paragraph 6 (f) of the same agreement does contain a "Technical Provisionary Surcharge" for at least the initial year of the agreement, and thus we leave to the factfinder the import of the paragraph in relation to EchoStar's contention that it was entitled to future high definition programming at no additional cost.

Further, there is ambiguity in the "Most-Favored Nations"

---

* Although Disney is not named as a defendant, the individual defendants are referred to collectively herein as "Disney."

clause of the ESPN agreement, which provides that Disney will not give competing distributors a lower "Net Effective Rate" than EchoStar's based on rates reduced by, inter alia, "in-kind consideration." A factfinder could reasonably conclude that the high definition networks that Disney provided to EchoStar's competitors for no additional charge constituted "in-kind consideration" within the meaning of the clause.

As is relevant to Disney's counterclaims, each of the agreements requires EchoStar to pay licensing and other fees within 30 days after a defined reporting period, in addition to a 15-day grace period. The agreements uniformly provide that "[a]ny amounts not paid by EchoStar within forty-five (45) days following the end of the Reporting Period for which such amounts are due shall accrue interest at the rate of one and one-half percent (1½%) per month or at the highest lawful rate, whichever shall be the lesser, compounded monthly from the date such amounts were due until they are paid." Each agreement also contains a clause stating that the agreements "cannot be changed or terminated orally and no waiver by either EchoStar or [defendants] of any breach of any provision hereof shall be or be deemed to be a waiver of any preceding or subsequent breach of the same or any other provision" of the agreements.

EchoStar readily admits that it never made its fee payments within the 45-day maximum time allowable by the agreements. Rather, it made payments, on average, within 75 days of their due date. Disney accepted these payments, none of which included accrued interest, without protesting their lateness. Indeed, as EchoStar points out, Disney employees praised EchoStar employees when they sped up payments in response to the formers' requests. Disney never mentioned EchoStar's interest obligation until sometime after October 31, 2005, in response to a claim by EchoStar that Disney had breached the "most favorable nation" provision in the ESPN agreement. In a letter to a senior EchoStar executive refuting that claim, Disney's vice-president for national accounts observed that EchoStar had been significantly delinquent in its monthly payments, and stated that if EchoStar continued to pay beyond the 45-day deadline, Disney "will begin imposing interest as outlined in . . . the Agreement."

In January and February 2006, ESPN's senior director of accounting sent letters to EchoStar's controller formally demanding payment of outstanding interest for the October and November 2005 payments, which had accrued pursuant to the ESPN agreement. Despite the letters, EchoStar continued to make payments late and without remitting interest on the late

payments, and Disney continued to negotiate EchoStar's checks without protest. On four separate occasions, once in 2007, and three times in early 2008, EchoStar submitted payment to a Disney lockbox designated for payment, with an accompanying letter stating that the checks enclosed were "as full and final payment of all outstanding amounts owed by" EchoStar to Disney.

In January 2008, EchoStar commenced this action, alleging in its complaint that Disney breached each of the three agreements by demanding payment from EchoStar for the right to broadcast each of the licensed networks in high definition. In its answer, Disney asserted a counterclaim for any and all interest which had accrued over the life of each agreement as a result of EchoStar's failure to make timely payments thereunder. In its reply to the counterclaim, EchoStar asserted, inter alia, the affirmative defenses of accord and satisfaction, estoppel, and waiver, as well as a defense that the parties modified the interest provisions of the agreements through a course of conduct.

Disney moved for summary judgment on its counterclaim, contending that it engaged in no conduct which manifested a knowing intention to relinquish its right to collect interest from EchoStar. Supreme Court granted the motion (it simultaneously denied EchoStar's motion for summary judgment dismissing the counterclaim). The court first found that the four letters stating that the enclosed checks represented "full and final payment of all outstanding amounts owed" did not constitute an accord and satisfaction because they did not expressly condition payment on Disney's relinquishment of any right to collect other amounts owed. The court separately identified, but did not individually analyze, each of the three other main defenses relied on by EchoStar, that is, waiver, estoppel and modification by contract. Rather, it combined them into a discussion of waiver. Relying on the doctrine that "a waiver is not to be lightly presumed," the court found that EchoStar had not "attributed any conduct of the defendants that caused EchoStar to believe that [Disney] would not seek the interest payments to which [it was] contractually entitled."

As the motion court correctly observed, it is axiomatic that waiver "is an intentional relinquishment of a known right and should not be lightly presumed" (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d 966, 968 [1988]). Such intention " 'must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act' " (*Navillus Tile v Turner Constr. Co.*, 2 AD3d 209, 211 [2003], quoting *Orange Steel Erectors v Newburgh Steel Prods.*, 225 AD2d 1010, 1012 [1996]). Here,

EchoStar tethers its waiver argument to the fact that Disney never made concerted efforts to collect interest despite its unquestionable right to do so in light of the former's repeated late payments of licensing fees. However, Disney's failure to press for interest amounts to mere silence or inaction, which are insufficient to establish an intent to waive a known right (see Courtney-Clarke v Rizzoli Intl. Publs., 251 AD2d 13 [1998]). EchoStar points to no affirmative action on Disney's part from which one can infer that Disney surrendered its contractual right to demand interest. To the contrary, Disney reaffirmed to EchoStar its entitlement to interest in a letter written to a top EchoStar executive less than one year after the agreements became effective. Also, there was no requirement in the agreements that EchoStar calculate and include interest in its periodic remittances. The agreements merely provide that interest on late payments shall accrue at a stated rate. Thus, Disney's acceptance of checks without interest included is of no moment. Moreover, the agreements do not provide any time frame within which Disney was required to press a claim for accrued interest.

Merely because Disney accepted late payments does not mean it waived the right to collect interest. That was a right reserved to it in agreements negotiated between both parties, each of which had equal bargaining power, presumably so that, in the event EchoStar did pay late, it would not gain a windfall by enjoying whatever return on investment could otherwise have been realized by Disney. EchoStar, a sophisticated party if ever there was one, could not have been surprised by Disney's counterclaim for interest. To the contrary, it would have been naive for it to have expected that Disney would not seek compensation through interest for the loss of use of the funds.

It is this distinction between Disney's *choice* to allow late payments and its *right* to collect interest that renders inapposite the cases cited by EchoStar. For example, in *Snide v Larrow* (93 AD2d 959 [1983], *affd* 62 NY2d 633 [1984]), the plaintiffs, seeking to foreclose on the home they sold to the defendants, were found to have waived their right to declare the defendants in default based on late payment where they were found to have accepted late payments over an extended period of time. There is no discussion in that case of whether the plaintiff was entitled to collect interest. Similarly, in *Madison Ave. Leasehold, LLC v Madison Bentley Assoc. LLC* (30 AD3d 1 [2006], *affd* 8 NY3d 59 [2006]), the issue was whether the defendant breached its lease by failing to make timely rent payments, a default which would have triggered the obligations of an individual guarantor. This Court only considered whether the landlord waived its right to

demand timely payment by repeatedly accepting late payment. Again, here, it is irrelevant whether Disney waived its right to demand timely payment. Rather, the question is whether it relinquished its right to demand interest, which none of EchoStar's cited cases answers.

We also reject EchoStar's contention that Disney modified the agreements by failing to enforce the interest provisions upon the receipt of each late payment. Even if Disney's conduct could have altered the contracts despite the clauses stating that the agreements "cannot be changed or terminated orally," Disney's conduct of accepting late fee payments is, again, not indicative of an intention to relinquish the right to collect interest accruing as a consequence of the late payments.

Nor does EchoStar have a credible defense of equitable estoppel. A party will be estopped from invoking a contractual right where estoppel would "in the interest of fairness . . . prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought" (*Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P.*, 7 NY3d 96, 106 [2006] [internal quotation marks and citations omitted]). As discussed above, EchoStar was not justified in relying on its perception that Disney had decided not to enforce the interest provisions, because nothing about Disney's conduct permitted such an inference. Further, there was nothing misleading about Disney's failure to demand interest each time EchoStar submitted a late payment. In addition, EchoStar's claim that it would have submitted payments earlier had it known of Disney's intention to seek interest falls short, since it also contends that the process of calculating the monthly payments (which it agreed to do) was time-consuming and difficult to complete in the time allotted by the agreements. EchoStar's contention that it suffered an injustice because of Disney's conduct in condoning late payment is equally unavailing, considering that the alleged injustice was its having to honor an obligation negotiated into the agreements at arms length.

Finally, there was no accord and satisfaction. As EchoStar acknowledges, the amount in obligation must be *in dispute* before an accord and satisfaction may extinguish a debt. Here, that was not the case. While Disney made some efforts to remind EchoStar of its obligation to pay interest, there is no evidence that EchoStar ever communicated to Disney its belief that under the circumstances it did not owe interest. Thus, Disney could

not have known when it accepted the fee payments that EchoStar was conditioning such acceptance on a relinquishment of any future interest claim. In the cases cited by EchoStar, *Sarbin v Southwest Media Corp.* (179 AD2d 567 [1992]), *Hondares v TSS-Seedman's Stores* (151 AD2d 411 [1989]) and *Hirsch v Berger Import & Mfg. Corp.* (67 AD2d 30 [1979]), there was a bona fide, ongoing disagreement between the parties, each of which was aware of the other's position. In this case, EchoStar's senior vice-president testified that, after Disney demanded interest in January and February 2006, "[w]e never saw another word on this [interest issue] again."

We have considered the parties' remaining contentions and find them unavailing. Concur—Gonzalez, P.J., Mazzarelli, Andrias, Nardelli and Richter, JJ.