EPAC Tech., Inc. v John Wiley & Sons, Inc. (2024 NY Slip Op 00933)

EPAC Tech., Inc. v John Wiley & Sons, Inc.

2024 NY Slip Op 00933

Decided on February 22, 2024

Appellate Division, First Department

Oing, J.,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 22, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Jeffrey K. Oing
Peter H. Moulton Barbara R. Kapnick John R. Higgitt

Index No. 653979/18 Appeal No. 784 Case No. 2022-05229 

[*1]EPAC Technologies, Inc., Plaintiff-Respondent-Appellant,
v
John Wiley & Sons, Inc., Defendant-Appellant-Respondent.

Defendant appeals, and plaintiff cross-appeals, from an order of the Supreme Court, New York County (Robert R. Reed, J.), entered June 15, 2022, which denied both plaintiff's motion for partial summary judgment, and defendant's cross-motion for summary judgment dismissing the complaint.

John Wiley & Sons, Inc., Albany (Kevin H. Kim of counsel), for appellant-respondent.
Morrison & Foerster LLP, New York (Lena H. Hughes, J. Alexander Lawrence, Adam J. Hunt and Alexandra Avvocato of counsel), for respondent-appellant.

Oing, J.,

Defendant appeals, and plaintiff cross-appeals, from an order of the Supreme Court, New York County (Robert R. Reed, J.), entered June 15, 2022, which denied both plaintiff's motion for partial summary judgment, and defendant's cross-motion for summary judgment dismissing the complaint.
John Wiley & Sons, Inc., Albany (Kevin H. Kim of counsel), for appellant-respondent.
Morrison & Foerster LLP, New York (Lena H. Hughes, J. Alexander Lawrence, Adam J. Hunt and Alexandra Avvocato of counsel), for respondent-appellant.
Oing, J., On April 21, 2010, defendant John Wiley & Sons, Inc., a New Jersey-based education and research publishing company, and plaintiff EPAC Technologies, Inc., a digital printing and logistics software technology company with printing facilities in New Jersey (Edison Facility), California, Ohio, and Mexico, entered into a Master Service Agreement (MSA). The MSA was to continue for five years, until 2015, or upon "termination by either party in accordance with [the MSA]," whichever occurred first. Pursuant to the MSA, the parties agreed that Wiley would send content to EPAC, utilizing its proprietary EPAC2 technology and printing system, and EPAC would then print the textbooks within five days of receipt of the content. The EPAC2 technology streamlined the way in which books were printed in that Wiley was able to send book title files electronically over EPAC's server, and then those titles were fed directly into the EPAC automated digital printing, thereby drastically reducing the amount of time it took to print the books. The EPAC2 printing system is located in the Edison Facility (collectively, EPAC2 Assets) and in Ohio. EPAC's facilities in California and Mexico did not have the EPAC2 technology. Pursuant to the MSA, which is governed by New York law, Wiley was required to make a set number of purchases each year (Minimum Purchase Requirements) that increased with each year of the five-year contract. Section 2(e) of the MSA set forth the parties' respective production and ordering obligations.
On March 22, 2012, just under two years into the contract term, Wiley learned that EPAC sold the EPAC2 Assets to Lightning Source, Inc. (LSI) for $40 million. EPAC expressly covenanted not to print books for Wiley using the EPAC2 technology by granting LSI an exclusive license to produce books using that technology. On March 30, 2012, LSI's Senior Vice President of Finance emailed Lynn Terhune, the Supply Chain Manager at Wiley, along with an employee from EPAC, to arrange a conference call to discuss the transition of billing from EPAC to LSI. On April 9, 2012, Sasha Dobrovolsky, EPAC's CEO, informed Terhune, as well as others at Wiley, that the sale of the EPAC2 Assets to LSI included a limited license for the EPAC2 technology. In this same email communication, Dobrovolsky confirmed that the sale of the EPAC2 Assets and the granting of the limited license did not include Wiley's order for custom, nontime sensitive printing [*2]from EPAC's California facility. The custom work Dobrovolsky referred to was never part of the MSA, but rather was a separate line of business concerning workbooks, and not textbooks, all of which were printed at the California facility using EPAC1 technology. Dobrovolsky also informed Wiley that all amounts owed to EPAC as of March 21, 2012, the day before the asset purchase agreement was executed with LSI, were the assets of EPAC and should be remitted directly to EPAC. After the sale of the EPAC2 Assets to LSI, Wiley continued to use the same server to send orders to LSI to be fulfilled at the Edison Facility using the EPAC2 technology and paid LSI for the printing services.
In late April 2012, there was an email exchange between Dobrovolsky and Wiley's Director of Corporate Manufacturing, Kathy Collins, regarding the "formal assignment of the contract, with a waiver for the minimum volumes for 2012." Collins wanted to speak to Wiley's legal department before accepting anything from EPAC. In response, Dobrovolsky further explained that EPAC would give Wiley a waiver for the 2012 Minimum Purchase Requirements and thus, Wiley would not have to be concerned about what LSI might do or require. In November 2012, Collins emailed Dobrovolsky to confirm whether EPAC had indeed assigned the MSA to LSI, specifically asking if LSI might seek to enforce the Minimum Purchase Requirements. Neither Dobrovolsky nor anyone else from EPAC responded to the email. Neither party discussed their expectations regarding the continuation of the MSA, the termination of the MSA, or whether Wiley would still be held to the Minimum Purchase Requirements after the sale of the EPAC2 Assets.
Nearly three years later, in February 2015, Terhune reached out to Dobrovolsky and inquired about pricing at the California facility for EPAC's printing services. Dobrovolsky asked for more information so he could direct Terhune to the appropriate person. Terhune explained that Wiley was working on a global education project and would like to give more business to EPAC, but they needed to discuss pricing of their custom workbooks and were hoping to negotiate a decrease in price, as other printing companies had recently reduced their prices. Neither Terhune nor Dobrovolsky mentioned or referenced the MSA or the pricing structure contained in it.
In 2017, Wiley asked EPAC to submit a bid to become Wiley's sole supplier of printing services in the U.S. The parties engaged in an email exchange in which EPAC expressed its displeasure with having to participate in the bidding process. In this email exchange, EPAC raised the issue of Wiley's failure to meet its Minimum Purchase Requirements under the then expired MSA. The parties were unable to come to a resolution. In August 2018, over five years after the March 2012 sale of the EPAC2 Assets, EPAC filed this action against Wiley, seeking to enforce the MSA, specifically arguing that Wiley breached the MSA by failing to meet its Minimum Purchase [*3]Requirements in 2012, 2013, 2014 and 2015.
EPAC moved for partial summary judgment seeking an order declaring that Wiley breached the MSA by failing to meet the Minimum Purchase Requirements. EPAC also contended that it never assigned its rights under the MSA to LSI, and that Wiley was contractually barred from asserting the affirmative defense of waiver. Wiley opposed and cross-moved for summary judgment dismissing the complaint, arguing that EPAC repudiated the MSA when it sold the EPAC2 Assets. Wiley also argued that EPAC waived its right to enforce the MSA by remaining silent regarding any expectation that Wiley was still required to send its orders to EPAC after the sale of the EPAC2 Assets.
The motion court denied both parties' motions finding that discovery was needed on the issue of the MSA term "primary production"— specifically, what exactly it means and requires. The motion court also stated that the affirmative defense of repudiation is a fact-intensive inquiry and therefore cannot be resolved on a motion for summary judgment. As to Wiley's waiver argument concerning EPAC's purported inaction, the court found factual issues existed precluding summary judgment in Wiley's favor.
Wiley appeals and EPAC cross-appeals. EPAC maintains that it was entitled to summary judgment, advancing the same arguments it made before the motion court. As for Wiley, it continues to argue that EPAC waived its enforcement rights under the MSA and that EPAC's sale of the EPAC2 Assets rendered EPAC unable to meet its contractual obligation under the MSA.
Wiley's waiver argument is unavailing. The record demonstrates that the argument is based on EPAC's alleged inaction and equivocal statements concerning its rights under the MSA. That is sufficient to raise a triable issue of fact as to the waiver defense (see EchoStar Satellite L.L.C. v ESPN, Inc., 79 AD3d 614, 618 [1st Dept 2010]).
A different result obtains regarding Wiley's repudiation argument. "A repudiation can be either 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach'" (Norcon Power Partners v Niagara Mohawk Power Corp., 92 NY2d 458, 463 [1998], quoting Restatement [Second] of Contracts § 250). Put another way, "a party repudiates a contract 'where that party, before the time of performance arrives, puts it out of his power to keep his contract'" (Computer Possibilities Unlimited v Mobil Oil Corp., 301 AD2d 70, 77 [1st Dept 2002], lv denied 100 NY2d 504 [2003] quoting Union Ins. Co. of Phila. v Central Trust Co. of N.Y., 157 NY 633, 643 [1899]; see also Princes Point LLC v Muss Dev. L.L.C., 30 NY3d 127, 133 [2017]). "Besides giving the nonrepudiating party an immediate right to sue for damages for total breach, a repudiation discharges the nonrepudiating party's obligations [*4]to render performance in the future" (Computer Possibilities, 301 AD2d at 77 [internal citations omitted]; see also American List Corp. v U.S. News & World Report, 75 NY2d 38, 44 [1989]). Thus, if there were a repudiation, the rest of the case falls away, and Wiley would be entitled to summary judgment dismissing the complaint.
Resolution of this issue centers on section 2(e) of the MSA, which provides:
"Primary production shall be performed on the EPAC2 automated printing system ("EPAC2") that is located in Edison, New Jersey. The parties acknowledge that EPAC is committing a substantial portion of the EPAC2 system's capacity to [Wiley], and EPAC and [Wiley] must work together to coordinate the EPAC2 system capacity with [Wiley's] demands as they both evolve, to optimize performance. In addition, EPAC contemplates upgrades to and expansion of the EPAC2 system in the future, which may require temporary downtime at the Edison facility. EPAC will use commercially reasonable efforts to provide [Wiley] with not less than 30 days notice of any planned downtime at the Edison facility. Nevertheless, EPAC reserves the right to fulfill its obligations to deliver acceptable Work Product hereunder using other facility as necessary from time to time. Should EPAC produce the Work Product from a facility other than the Edison facility without the written consent of [Wiley], EPAC shall bear any increased freight cost of delivering the Work Product to [Wiley's] warehouse in New Jersey. The minimums set forth in Section 2(d) above shall be reduced pro rata for any period of time in which EPAC is unable to fulfill its obligations to produce the work product from any of its facilities" (emphasis added).
EPAC and Wiley disagree as to the meaning of "primary production . . . as necessary from time to time." EPAC argues that the sale of the Edison Facility is not a repudiation because section 2(e) permits EPAC to fulfill Wiley's print orders at its other facilities "as necessary from time to time." Conversely, Wiley asserts that EPAC's sale of the EPAC2 Assets prevents EPAC from engaging in the "primary production" of Wiley's print needs at that facility. The principle is well settled that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield v Philles Records, 98 NY2d 562, 569 [2002]). The "mere assertion by a party [however] that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of fact" (New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc., 28 AD3d 175, 177-178 [1st Dept 2006]).
EPAC contends that section 2(e) was designed to protect it from being unable to sufficiently utilize its EPAC2 technology at the Edison Facility, rather than obligate it to have primary production there. It posits that Wiley's printing needs under the MSA [*5]would be met at EPAC's California and Mexico facilities using EPAC1 technology. Relying primarily on Computer Possibilities (301 AD2d 70), EPAC is essentially arguing that because it maintained an element of discretion by its ability to print out of its other facilities "as necessary from time to time," it did not place the totality of its performance beyond its own capabilities and thus, there has not been a repudiation. In other words, because EPAC could still print out of its other facilities, a factual issue exists as to whether it repudiated the contract.
EPAC's reliance on Computer Possibilities is misplaced. The Computer Possibilities Court did not hold that if the repudiating party could find a way to fulfill a contractual obligation other than the one set out in the contract, there would be no repudiation. Instead, we held that where a party contracts with a nonparty to satisfy that party's contractual obligations, that party has repudiated the contract regardless of the fact that the nonparty performs all of the party's contractual obligations because that party "'put[] it out of [its] power'" to fulfill the contract (301 AD2d at 77-80, quoting Union Ins. Co. of Phila., 157 NY at 643). That situation is indistinguishable from the one in this appeal. Here, EPAC's sale of the EPAC2 Assets to LSI clearly "put it out of power" to perform its contractual obligations under the MSA. The fact that LSI may be able to perform under the MSA is immaterial. Indeed, the MSA clearly specified that EPAC was to primarily perform the printing services using the EPAC2 technology at the Edison Facility and permitted EPAC to print, as necessary from time to time, at its other facilities only as a mere accommodation by Wiley to EPAC for it to have a temporary shutdown of the Edison Facility to perform upgrades on the EPAC2 technology. The "as necessary from time to time" language limits EPAC's right to perform its printing obligations from its other facilities. Further, the sale of the EPAC2 Assets precludes EPAC from meeting its "primary production" obligation to use the EPAC2 technology at the Edison Facility by transforming the "as necessary from time to time" temporary measure to a permanent one. In other words, the sale simply meant that EPAC could no longer print any of Wiley's orders at the Edison Facility using the EPAC2 technology as contractually required by the MSA. EPAC sold the very assets it was required to use for primary production. In fact, under the exclusive licensing agreement with LSI, EPAC could no longer utilize the EPAC2 technology at all even though it was available at its Ohio facility. Thus, EPAC's reading of section 2(e) is fundamentally flawed because it would render meaningless its "primary production" utilizing the EPAC2 technology at the Edison Facility. "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the [*6]writing" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004]). Everest Reins. Co. v Galileo Weather Risk Mgt. Advisors, LLC (165 AD3d 519 [1st Dept 2018]) provides additional instructive insight. There, the parties memorialized a business deal in two emails. Defendant later sold its assets and discontinued doing business. The agreement, as contained in both emails, was silent as to the duration of the parties' relationship. The Everest Reins. Court found that "[b]ecause the agreement here is silent on any duration of time that [defendant] was required to locate potential deals for plaintiff, an issue of fact exists as to whether [defendant] repudiated the agreement by selling its assets and rendering itself unable to continue to do so" (id. at 520). Thus, Everest Reins. stands for the proposition that when the parties dispute the parameters of the obligation because the contract is silent as to the obligation in question summary judgment is inappropriate because there can be no repudiation of an obligation when the obligation is unresolved. Here, we know that the EPAC2 Assets were sold within the MSA's contractual period and what the contractual obligation is during that period: primary production using EPAC2 technology at the Edison Facility by EPAC. The sale of the EPAC2 Assets is a repudiation of the MSA.
Accordingly, the order of the Supreme Court, New York County (Robert R. Reed, J.), entered June 15, 2022, which denied plaintiff EPAC Technologies, Inc.'s motion for partial summary judgment and defendant John Wiley & Sons, Inc.'s cross-motion for summary judgment dismissing the complaint, should be modified, on the law, to grant defendant's cross-motion for summary judgment dismissing the complaint, and otherwise affirmed, without costs.
Order Supreme Court, New York County (Robert R. Reed, J.), entered June 15, 2022, modified, on the law, to grant defendants cross-motion for summary judgment dismissing the complaint, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.
Opinion by Oing, J. All concur.
Oing, J.P., Moulton, Kapnick, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 22, 2024